MR. JUSTICE SHEEHY,
dissenting.
On January 18, 1980, the majority of this Court entered its per curiam order directing the respondent District Court to proceed forthwith with voir dire examination of prospective trial jurors in the criminal case against Gene Andrew Austad, and vacating an earlier order of the District Court that the press and public be excluded from such voir dire examination.
We dissented to that order and now state our reasons.
We have no testimonial record before us in this case. Such facts as may be recited here are gleaned from the allegations in the petition, the responses thereto, and the exhibits which have been filed. What we say here respecting the purported facts is not to be construed in any present or future proceedings as an indication by us that we have prejudged what the facts may eventually turn out to be.
On April 27, 1978, an information was filed in the District Court, Eighth Judicial District, Cascade County, against Gene Andrew Austad. He was charged with five felonies, alleged to have been committed on April 21, 1978 in Great Falls, including two *442 counts of deliberate homicide, and one each of robbery, sexual intercourse without consent, and aggravated burglary.
In the early morning hours of April 22, 1978, Austad suffered severe injuries to his person as a result of an accident in or near Great Falls, which occurred while Austad was engaged in a high-speed chase between an automobile he was driving and one operated by the Great Falls police. He had been stopped for a traffic violation investigation, attempted to leave the scene, and the chase ensued. Following the accident in which Austad was injured, the authorities discovered evidence of the commission of another offense, and the subsequent investigation of this possible offense led to the discovery of the body of Mabel Wald then aged 69, the victim of the offenses charged against Austad in the information above detailed.
Because of the injuries which Austad received in the accident, he was hospitalized in Great Falls. His condition was such that a preliminary hearing in the criminal case against him was not had until September 18, 1978. On October 4, 1978, the defendant, through his counsel from the public defenders office filed a motion for an order to control prejudicial publicity. That motion was denied by the District Court on October 18, 1978, the court then finding that the pretrial coverage by the press had not prejudiced the defendant.
Austad was arraigned on December 27, 1978, remained silent, and the court entered his plea of not guilty to all of the charges. Since there was a question as to the physical fitness of the accused to proceed, the District Court directed his psychiatric and medical examination.
In early February, 1979, Austad was released from the hospital. The District Court reduced his bail so that he could be taken to the home of his parents and be given the personal care required by his then physical condition.
On May 31, 1979, defendant filed a motion for change of place of trial. On June 1, 1979, defendant filed a motion for sequestration of jurors during voir dire examination and during trial. On *443 June 4, 1979, the defendant moved for individual voir dire examination of the prospective jurors, which latter motion was granted by the court.
On July 9, 1979, the District Court ordered memoranda from all parties and from the State and defendant’s counsel to advise him on the question of defendant’s fitness to proceed relating to the issues of his ability to be of assistance to his counsel and to communicate with him; the extent to which the State’s evidence could be reconstructed, not only as to the offense itself, but as to the possibility of the defense of alibi; and for any further comment on the psychiatric, medical and neurological reports which the court had received. A hearing on this order was held on August 24, 1979 in chambers before the court in camera.
On October 2, 1979, the court made findings determining that the defendant’s physical condition made it possible for him to proceed to trial with certain limitations, and ordered jury trial to commence on November 26, 1979. He further set all pending motions for decision on October 29, 1979. On October 15, 1979, Austad moved to close the pretrial proceedings.
On October 29, 1979, the hearing was closed to the press and public, and thereafter, on November 1, 1979, the District Court made the following orders:
(a) Denied Austad’s motion for funds to hire a professional survey team to conduct a telephone survey in Great Falls regarding the Gene Gustad case.
(b) Denied various motions of the defendant to dismiss on grounds of misconduct of prosecution.
(c) Granted defendant’s motion to close proceedings to the press and public.
The jury trial date was continued to December 3, 1979 and on that date, an initial panel of 50 jurors were sworn. The court determined that examination of the prospective jurors would be individual and then released the jury panel until further call of the court.
*444 On December 4, 1979, at the beginning of voir dire, the court directed that the individual voir dire examination of the prospective jurors be closed to the public and the press.
On December 14, 1979, the Great Falls Tribune filed with this Court a petition for a writ of supervisory control directing the Honorable H. William Coder to permit a Tribune representative to attend the voir dire proceeding, or in the alternative, to hold a hearing and enter findings and conclusions which would show that the defendant’s right to a fair trial was jeopardized.
When the Tribune filed its petition, voir dire examination of the jurors in the Austad trial was then under way. On the same date as the petition was filed, we issued an order stating all further proceedings in the Austad trial, and directed Judge Coder to hold a hearing and to submit to us findings of fact and conclusions of law as to his reasons for closing the trial proceedings to the press and public.
The hearing has been provided by the District Court. On January 10, 1980, the District Court filed its findings of fact and conclusions of law and order. In summary, Judge Coder concluded that the right of the accused, Austad, to a speedy public trial by an impartial jury in Cascade County required individual voir dire examination of the prospective jurors closed to the press and public until such time as the jurors and alternates are duly sworn and empaneled.
Counsel for Austad filed a motion to dismiss these proceedings on December 18, 1979. The Tribune filed its objection to said motion. The Cascade County Attorney has also filed a brief in this matter. We ordered oral argument on the findings of fact and conclusions of law submitted by the District Court to be held before us on January 18, 1980.
The position of the Tribune had not been changed, that no reason existed for the exclusion of the press and public from the voir dire examination of the prospective jurors in the criminal trial. The position of the County Attorney is that he would not attack the order of the district judge and so he took no position pro or con as *445 to the order. The position of counsel for Austad, while supportive of the district judge, indicates rather strongly that they would prefer that the trial of Austad be moved to another county. Judge Coder himself, as a named respondent in this action, appeared and argued in support of the order that he issued.
The foregoing recapitulation summarizes the proceedings had in the District Court and before this Court that led to our order of January 18, 1980 vacating the closure stricture imposed by the District Court.
We believe from the materials before us that Gene Andrew Austad, age 29 at the time of the crimes charged against him, is a Great Falls resident who is severely physically incapacitated. He sustained closed-head injuries which have resulted in retrograde and anterograde amnesia which is permanent; dysarthia, that is difficulty with speech due to the weakness of his voice muscles; double vision; spastic quadraparesis, which necessitates the use of a wheelchair although he is able to stand and walk very short distances with the assistance of two aids; and a mild degree of diffuse cerebral dysfunction. The District Court found that in spite of his amnesia, which relates particularly to the incidents involving the crimes charged, he is nevertheless mentally able to attend trial. He communicates in some degree with his counsel so that he is able to aid in his own defense; but his physical condition is such that he would not be able to be present in the courtroom for an entire day. Therefore, the trial is scheduled to be conducted on a part-day basis and is “programmed” for 8 weeks.
Defendant’s counsel has filed in the District Court 92 exhibits relating to press coverage of the defendant and his trial. They include news items running in the Great Falls Tribune, scripts of television broadcasts relating to Austad, and letters to the editor printed in the Tribune. In short, they depict a murder in which the 29-year-old defendant is alleged to have raped a 69-year-old woman, and then murdered her by cutting her throat and sticking a butcher knife in her chest; his fleeing from the police in the high speed auto chase at speeds up to 89 miles per hour; the termination *446 of the chase when the Austad vehicle ran into 9 parked automobiles at a Great Falls auto dealership; his subsequent confinement to the hospital for several months before he was able to be arraigned. There is not need to embellish those facts for a sensational effect. Their very recitation arouses a vindictive ire in the reader’s mind.
No playwright, not Shakespeare himself, could devise a scene more packed with high drama in a constitutional face-off than is presented here. On the one hand, the press, towering and majestic, robed in the First and Fourteenth Amendments. On the other, the defendant, cowering and pathetic, crippled and charged as despicable, uncomfortable in the poorly-lighted and low-heated Sixth Amendment. In the middle, the district judge, flowering with rhetoric, defending his reach for a surgically-clean vacuum in which to achieve a fair trial. Had this setting been fiction, it had seemed implausible. It is reality, and stranger than fiction it has escaped the grasp of the majority of this Court.
Let us dispose at the outset of the nonissues that cropped up in this case. First, the voir dire examination of prospective trial jurors is a part of the trial itself. That is too clear for cavil. It is announced by every trial judge in every jury case when at the outset before the jury panel is sworn, he asks of the parties if they are ready for trial. This is a nonissue because, as we shall demonstrate, every United States Supreme Court justice but one has agreed that a trial court has the power to close all or a part of the criminal trial to the public. That holding must include the jury voir dire examination. The Great Falls Tribune itself does not dispute this power, as oral argument revealed.
The second nonissue is whether the pervasive press stories on the purported facts of the crime were misrepresentation. Of course, if the press were culpable, it would be easier to rule, but it is not necessary to look for culpability on the part of the press in a case like this. That is not the issue which determines whether the voir dire examination should be closed. What must be examined is whether the facts of the crime as printed or broadcast, true or false, make it likely that an impartial jury cannot be empaneled in the *447 area from which a jury will be drawn. Thus if the press had misrepresented the facts, but the jury panel atmosphere was not befouled thereby, no right would exist to close the voir dire examination. Conversely, if the reported facts without misrepresentation create an atmosphere in which a fair jury cannot be found, defendant’s right to a fair trail would require some action by the District Court to ensure a fair trial. The permeating overriding query remains: did the press stories prevent a fair impartial jury? If yes, the district judge acted properly and constitutionally; if not, he acted improperly and unconstitutionally.
The third nonissue relates to the fact that when the District court announced that he was closing the proceedings to the press (as he did on a previous occasion in the same circumstances) the reporter left the room without objection. We would hold, and0 Gannett Co., Inc. v. DePasquale (1979), . . . U.S. . . ., 99 S.Ct. 2898, 61 L.Ed.2d 608, does hold that the lack of objection by the reporter is not binding on the press or the publisher of the paper and properly so, for it is not within the ostensible authority of a reporter to waive First Amendment rights of his newspaper unless specifically authorized.
Since the Great Falls Tribune has granted in oral argument, whether one is considering the federal or the state constitution, that a District Court does have the power under proper circumstances to close all or a part of the criminal trial, the real issue of the case boils down merely to a difference of opinion as to whether such proper circumstances exist: the Tribune is of the opinion that its coverage is truthful, nonsensational, and not overdone; therefore, it cannot be excluded from voir dire examination even if press coverage did create an unfavorable jury climate for the defendant. The trial judge is of the opinion that the facts have been misrepresented in the press, overemphasized, and unabatedly published; that the demands of the constitution, state or federal, for a fair trial in this case require two things: (1) individual examination of the prospective jurors outside the presence of the rest of the panel; and, (2) exclusion of the press from such individual voir dire examination to preserve its sanctity.
*448 Which opinion does the record in this case support? Clearly, the district judge. At least 70 exhibits of Tribune articles and television scripts, all in the Great Falls area, show a repeating pattern of recitation that the defendant is charged with raping and killing a 69-year-old woman on April 21, 1978. Some articles report her body was found with a knife protruding from her chest. Others state that the defendant, following the crime engaged the police in a high speed auto chase (it is on this point that the district judge charges misrepresentation) that ended when his auto crashed and overturned, injuring him to his present condition. The articles have continued unabatedly in the paper and on television to the time of the trial itself, and even through the period while the matter has been before this Court. The publications, in time-span, volume, and modes of media, exceed by far the publications described by Justice Blackmun in Gannett. Moreover, at the hearing before the district judge requested by the Tribune and granted by us, a psychologist testified that individual examination of trial jurors and voir dire presented the best chance for honest, candid, complete answers from jury candidates. Ordinarily press coverage of such private individual examinations would destroy their objective. Against this impressive array of pervasive jury-contaminating influences, the Tribune offered not one smidgen of evidence in the hearing it had requested.
Based on the record before us, the district judge made findings and conclusions for submission to us. In a matter of this constitutional weight, this Court need not surrender to the discretion of the District Court the ultimate power of findings of fact that ordinarily would be accorded under Rule 52, M.R.Civ.P. (identical to Rule 52, F.R.Civ.P.). Especially is this true in an original proceeding in this Court, such as this case. But we owe, in courtesy to the District Court, some logical and detailed explanation why his findings are overruled by us on a record such as this. He is after all at the scene of the trial, with a feel for what is taking place in the case he is supervising. He has the experience now of the voir dire examination of some 30 jury panel members. His opinion is entitled to a good deal of weight, in the light of his record as a trial judge.
*449 The Tribune argues nonetheless that the record here of prejudice is deficient; that no affidavit has been filed by persons claiming they have been prejudiced by the press, coverage; that the District Court has merely assumed prejudice; and that this Court has held that a juror with a pre-formed opinion may yet serve as a juror if he testifies that he can set aside the prejudice and decide upon the evidence of the case. We could answer that 10 of the 30 plus persons who have been examined have said they are indeed prejudiced and have been excused for cause. That is not the kind of response we should make however, because it does not really meet the true legal issue in the case.
The Tribune would have us adopt as a prevailing rule that the test of a befouled jury atmosphere is the same as that applied to determine the impartiality of a jury candidate. No so. In the dissent in Gannett upon which the Tribune so strongly relies, Justice Blackmun set out a three-fold test for this type of case which should be determinative. It is a test We could adopt here, and if adopted, we would perforce support the district judge and act perfectly in accordance with the state and federal constitutions.
The Gannett case (Gannett Co., Inc. v. DePasquale (1979), ---U.S..---. 99 S.Ct. 2898, 61 L.Ed.2d 608) is the measuring stick on what our decision should be here. It is recent, it is on all-fours, and we have written comment by at least 4 of the 9 Supreme Court justices on the matter. Even without agreeing with the majority in Gannett postulated. We will examine Gannett in detail to demonstrate this.
The facts in Gannett, when compared with those of Austad, show that the Austad case presents a far more compelling reason for the closure of the voir dire examination.
Gannett involved three defendants, two men and an unidentified woman, who were charged in Seneca County, New York, with the crimes of second degree murder, robbery and grand larceny, the woman being indicted only on the count of grand larceny. It appears that the victim, Wayne Clapp, had disappeared while on a boat ride with the defendants on Lake Seneca. Shots had been *450 heard, and bullet holes found in the boat which indicated that Clapp had been the victim of foul play. There were 14 news articles covering the events from July 20 to August 6 of the year in question, reported by two newspapers owned by Gannett, the Democrat And Chronicle, the morning paper, and the Times-Union, the evening paper. Some of the fourteen stories were identical in the two papers. Public interest in the case was aroused because the State was proposing to try the defendants without having found the body of the victim. From Justice Blackmun’s dissent (--U.S. at--, 99 S.Ct. at 2919, 61 L.Ed.2d at 639) we learn that from 90 days preceding the hearing on a motion to suppress confessions, there were no publications. It also appears that the stories consisted entirely of straightforward reporting of the investigation, arrests, and charges; no “editorializing” and nothing that a fairminded person could describe as sensational journalism. There was one photograph. The headlines were factual; nothing indicates that the stories were placed on the page within the paper so as to play up the murder investigation, the stories were relatively brief, appeared only in connection with each development of the investigation, and gave no indication of being published to sustain popular interest in the case.
At the hearing on the motion to suppress the confessions, defense counsel moved to exclude the press from the hearings. The district attorney did not object and the court forthwith entered a closure order. Those are the facts in Gannett.
For the purpose of this discussion on the Austad case, we may concede that the articles appear to be straightforward reporting of the facts surrounding the investigation, arrest and charges against Austad. There does not appear to be any attempt to “editorialize” or to enter into sensational journalism; the stories are fairly placed in the successive issues of the Tribune, the headlines are factual, the stories relatively brief. Nearly every time, for reference, the stories reflect that Austad is charged with the rape-murder of Mabel Wald, age 69. We have mentioned other items appearing in the Tribune stories.
*451 In addition to the Tribune stories, there was a television news coverage of which scripts have been supplied in this record. Nothing in the Gannett case shows us what the television coverage was as to the Clapp murder. The television coverage of the Austad case continued in much the same manner as the Tribune coverage, reporting each succeeding development in the investigation, arrest, arraignment and prospective trial of Austad.
The pervasiveness of the publications is greater in Austad than it was in Gannett. We find from Gannett that the two newspapers in question are published in Rochester, Monroe County, New York, 40 miles from the Seneca County line. The circulation of the newspapers is primarily in Monroe County. There are subscribers however, in Seneca County. In 1976, when the case arose, the Democrak And Chronicle had a Seneca County daily circulation of 1,002 and the Sunday circulation 1,532. The Times-Union published only a daily edition and had only one subscriber in Seneca County. Seneca County’s 1976 population was set by the Bureau of Census at 34,000. It appears from a footnote that the only record offered in the Gannett case related to the publications that appeared in these two newspapers. There was nothing about the television coverage or other newspapers in Seneca County at the time.
Compare that with the Austad case. The Great Falls Tribune is the single daily newspaper published in Cascade County. Its reported daily circulation is approximately 45,000 though it must be admitted that a substantial portion of its circulation goes outside of Cascade County. However, the Tribune enjoys a considerable saturation of the households in Cascade County. The County itself had a 1970 population of 81,804 persons and an estimated January 1, 1979 population of 85,100 persons. Seven radio stations operate in Great Falls, 3 F.M. and 4 A.M. There are two television stations also broadcasting in Great Falls.
On a comparable basis, therefore, from what appears in Gannett, and what we see in Austad, the press coverage of the incident in Austad was greater and more pervasive and reached more *452 potential jurors. Added to this conclusion is the fact that in Gannett, as Justice Blackmun pointed out, the publication was not unabated, there being 90 days of no publication between the last newspaper article and the hearing on the motion to suppress. Here in Austad, the publication has continued unabated and the proceedings of the trial are being reported even now. We do not decry this continuous publication of facts that the public has a legitimate interest to receive; we simply state that the publications have occurred for the purpose of showing the background facing Judge Coder when he decided that to obtain a fair jury, he had to close the voir dire examination.
The justices making up the majority of the court in Gannett were Stewart, who delivered the opinion of the Court, with concurring opinions by Burger, Powell and Rehnquist, and Stevens who joined the principal opinion. The dissenting opinion was written by Blackmun, and Brennan, White and Marshall joined in the dissent which by the way also concurred in part with the majority.
There is no doubt that the majority sustains the right of a trial court to take protective measurers to insure a fair trial. The majority said:
“This Court has long recognized that adverse publicity can endanger the ability of a defendant to receive a fair trial. [Citing cases.] To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. [Citing a case.] And because of the Constitution’s pervasive concern for those due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary.” 99 S.Ct. at 2904, 61 L.Ed.2d at 620.
The majority in Gannett then went on to examine the constitutional claim that the press had a right of access as a part of the public to criminal trials at any stage of the proceedings. The majority found that the provisions of the Sixth Amendment giving to the defendant a “right to a speedy and public trial by an impartial jury” is for the benefit of the defendant and there is not the slightest *453 suggestion that there is any correlative right in members of the public to insist upon a public trial. It agreed that a defendant does not have the right to command a private trial but settled on the issue that members of the public do not have an enforceable right to a public trial that could be asserted independently of the parties to the litigation. 99 S.Ct. at 2906, 61 L.Ed.2d at 624. It further found that there was no common law right on the part of the public to attend the criminal trial and that the history of the common law demonstrated only the existence of a common law rule of open, civil and criminal proceedings. 99 S.Ct. at 2908, 61 L.Ed.2d at 624. It then went on to find that the Sixth and Fourteenth Amendments to the Constitution do not grant any right to attend such pretrial proceedings which as were before the Court in Gannett. 99 S.Ct. at 2911, 61 L.Ed.2d at 628. Finally, in examining the First and Fourteenth Amendments, it found no constitutional impediment in those amendments because the press at any rate would eventually have the right to access to a transcript and further because the denial of access was only temporary. 99 S.Ct. at 2912, 61 L.Ed.2d at 629.
The concurring opinions are of interest. Chief Justice Burger, in concurring, emphasized that the motion to suppress evidence was not a trial, but a pretrial proceeding. For that reason, we do not count him as supporting the proposition of the majority that trial proceedings in any event may be closed by a court without violating federal constitutional rights.
Justice Powell, in concurring, set the question as we believe it should be posed:
“. . . The question for the trial court, therefore, in considering a motion to close a pretrial suppression hearing is whether a fair trial for the defendant is likely to be jeopardized by publicity, if members of the press and public are present and free to report prejudicial evidence that will not be presented to the jury.” 99 S.Ct. at 2916, 61 L.Ed.2d at 634.
*454 Justice Rehnquist, in his concurring opinion, cautioned that there is no set procedure to be employed by a trial court to determine whether or not a part of the trial should be closed. He said:
“. . . To the contrary, in my view and, I think, in the view of a majority of this Court, the lower courts are under no constitutional constraint either to accept or reject those procedures. They remain, in the best tradition of our federal system, free to determine for themselves the question whether to open or close the proceeding. Hopefully, they will decide the question by accommodating competing interests in a judicious manner. But so far as the Constitution is concerned, the question is for them, not us, to resolve” 99 S.Ct. at 2918-19, 61 L.Ed.2d at 637-38.
We advert now to the finding of Judge Coder in Austad which illustrates why he reached the same conclusion as did the majority in Gannett:
“The evidence submitted to the court in support of defense motions to control pretrial publicity, change of place of trial, sequestration, continuance and related matters indicated, among other things, that the publicity has been substantial’ that it or other portions of it originated from the prosecution and police; that it discloses evidence not generally known to the public; that it discloses the accused’s prior criminal record, and speculates on his involvement in similar criminal activities; further that such publicity contains material misrepresentations of known facts; that such misrepresentations by the very nature are highly prejudicial and by the very repetition and continued republication, up to and including the time of the jury selection, can only be viewed by an attempt to influence the public and prospective jurors regarding the guilt of the accused Austad.” Findings, XXII(l).
If Justice Rehnquist is correct in his view of the majority of the United States Supreme Court, Judge Coder was under no constitutional constraint either to have further hearings on the matter or to look to this Court for guidance; he was “free to determine for [himself] the question [of] whether to open or close the proceeding”. 99 S.Ct. at 2919, 61 L.Ed.2d at 638.
*455 The foregoing demonstrates that under the majority view in Gannett, the order of Judge Coder closing the voir dire examination in this case should have been sustained. We will now demonstrate that even under the view of the minority in the Gannett case, he would likewise be sustained.
Justice Blackmun, writing for the dissenting justices, disagreed with the majority in that he found that the public trial provisions of the Sixth Amendment provided a right of access to the public to trials. He saw little difference in a pretrial suppression hearing and the trial itself for the purpose of the Sixth Amendment. 99 S.Ct. at 2934, 61 L.Ed.2d at 657. Nonetheless, he saw that trial courts in certain circumstances must have the right to close trials to the public. He said:
“... Because of the importance we attach to a fair trial, it is clear that whatever restrictions on access the Sixth Amendment may prohibit in another context, it does not prevent a trial court from restricting access to a pretrial suppression hearing where such restriction is necessary in order to insure that a defendant not be denied a fair trial as a result of prejudicial publicity flowing from that hearing [citing a case].” 99 S.Ct. at 2936, 61 L.Ed.2d at 659.
Justice Blackmun then proposed a threefold test to support a finding that the fair trial right of a defendant would be irreparably damaged if the proceeding were conducted in public. Under that test, the accused would establish:
“First, he should provide an adequate basis to support a finding that there is a substantial probability that irreparable damage to his fair trial right will result from conducting the proceeding in public. This showing will depend on the facts . . .
“Second, the accused should show a substantial probability that alternatives to closure will not protect adequately his right to a fair trial. One may suggest numerous alternatives, but I think the following should be considered: continuance, severance, change of venue, change of venire, voir dire, peremptory challenges, sequestration, and admonition of the jury . . .
*456 “Third, the accused should demonstrate that there is a substantial probability that closure will be effective in protecting against the perceived harm . . .
“If, after considering the essential factors, the trial court determines that the accused has carried his burden of establishing that closure is necessary, the Sixth Amendment is no barrier to reasonable restrictions on public access designed to meet that need. Any restrictions imposed, however, should extend no further than the circumstances reasonably require ...” (Emphasis added.) 99 S.Ct. at 2937-39, 61 L.Ed.2d at 660-62.
Judge Coder has met the tests proposed by the minority in Gannett. Having determined that the adverse publicity was prejudicial, he considered the alternatives. He examined the possibility of sequestration and determined it would be necessary to sequester 75 to 100 at the outset. He calculated the sequestration of 75 jurors would cost the county $3,225 per day and projected a prospective cost for a three week trial of $32,000 simply for sequestration. On the basis of cost, the logistical problems involved, and the unconscionable burden on the prospective jurors that would be called for in sequestration, he discarded that as a possibility. He next looked at the possibility of a change of venue. The law requires the removal to a county not adjoining the county in which the crime was committed. Here he had a defendant confined to a wheelchair who required daily assistance to get to and from the proceedings, and required help in the performance of the simplest physical functions. Again, the trial could only be conducted for 3% hours per day because of the defendant’s physical condition. Sixty witnesses are listed on the information of which all but two are residents of the Great Falls area. He therefore discarded the possibility of a change of venue. A continuance was out because already 20 months had elapsed since the date of the crime. He therefore determined that individual examination on voir dire was necessary, and *457 that publication of the voir dire would be detrimental to the defendant, saying:
“By reason of the nature of the offenses charged and the quantity and quality of pretrial publicity the voir dire of the prospective jurors will be extensive, and by necessity will involve examination not only on the grounds for disqualification for cause as enumerated by statute, but also the individual jurors opinions, feeling, biases and prejudice, whether inherent or traumatically induced, anent the offenses charged. That such examination by both the defense and prosecution is unquestionably necessary to the intelligent exercise of their peremptory challenges.
“To expose these jurors, their responses to such voir dire questions, together with their names and addresses would have such a chilling effect on their candor and willingness to appropriately respond to such questions as to render nugatory the purposes of individual voir dire.”
We submit that the temporary protective measure taken by the District Court was strictly and inescapably necessary and would have been supported, even by the minority in Gannett.
We have demonstrated that whether one agrees with the minority in Gannett that the Sixth Amendment provides the public a right to access to a criminal trial, or with the majority, that there is no such right, the District Court offended no federal constitutional right of the Tribune in making its temporary closure order. However, the Tribune also contends that under Article II, § 9, of the 1972 Montana Constitution their right to attend the voir dire examination exists apart from the federal constitution.
Article II, § 9, states:
“Section 9. Right to know. No person shall be deprived of the right to examine documents or to observe the deliberations of a public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.”
If we were to construe Article II, § 9 as an absolute requirement that the courts of this state be open to the public at all times, we *458 would run afoul even of the minority opinion in Gannett, which holds that at the least, there must be a hearing to establish that the closure is strictly and inescapably necessary. There is no need to so hold in this case, however, because the Tribune has conceded in oral argument that it does not contend that courts may never close their proceedings to public scrutiny. Again, it is a matter of constitutional balance. The public’s right to know, set forth in the Montana Constitution, must in this case, give away to the defendant’s federal constitutional right to a fair trial. Indeed, Article II, § 9 of the Montana Constitution must be balanced with Article II, § 24 of the same constitution which gives an accused a right to a speedy trial “by an impartial jury of the county or district in which the offense is alleged to have been committed.” Implicit in that last constitutional provision is the duty and authority of a court to take such protective measures as may be necessary to insure the accused is given a trial by an impartial jury.
The majority opinion leans heavily on the 1972 Montana Constitution, Article II, Section 9, the “right to know” provision. We are not persuaded that the federal guaranty of a fair trial, a constitutional right accruing to an individual, can be overridden by a state constitutional provision which is at best a declaration of state constitutional policy. The supremacy of the federal Constitution, declared in Article VI and recognized fully by all courts, precludes any intrusion in the guise of state action that would invade or degrade the federal fair trial guaranty. Even if the state constitutional provision is not expressly designed to impair the individual’s Sixth Amendment rights, the Supremacy Clause, bars that effect where necessary. See as an example, Grimes v. Hoschler (1974), 12 Cal.3d 305, 525 P.2d 65, cert. den. 420 U.S. 973, 95 S.Ct. 1394, 43 L.Ed.2d 653.
As members of this Court, and personally, we are committed to the principle of the public’s right to know. However, we cannot concur that such right is absolute, and that it overrides a defendant’s right to an impartial jury. We cannot and do not predict the future; but it may well turn out that in the Austad case, this Court *459 has invited disaster, as the district judge stated in his oral argument.
To close, we must remind ourselves that, important as may be the role of the press in keeping citizens informed, it is not in so doing exercising a governmental function. The press is still the Fourth Estate. Its power and right are not on a par with the governmental power and right of the District Court of the Eighth Judicial District, a power derived directly from the citizens through their duly adopted constitution. In all cases where the duty of the press to keep citizens informed collides with the duty of the court to ensure an accused a fair trial, the duty of the court must prevail.
MR. JUSTICE HARRISON concurs in the foregoing dissent.